McGREGOR W. SCOTT
United States Attorney
PAUL HEMESATH
MICHAEL M. BECKWITH
Assistant United States Attorneys
501 I Street, Suite 10-100
Sacramento, CA 95814
Telephone: (916) 554-2700
Facsimile:  (916) 554-2900

Attorneys for Plaintiff
United States of America

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO.  2:17-CR-00044 KJM |
| Plaintiff, | OPPOSITION TO MOTION TO SUPPRESS EVIDENCE |
| v. | DATE: March 30, 2020 |
| JAMIE RICHARDSON, ROMMELL CIPRIANO, MICHAEL SNOWDEN-HALL, and JAYMAR ROSS, | TIME: 9:00 a.m. COURT: Hon. Kimberly J. Mueller |
| Defendants. | |

**GOVERNMENT'S OPPOSITION TO MOTION TO SUPPRESS EVIDENCE**

# TABLE OF CONTENTS

I.      INTRODUCTION .................................................................................................1

II.     STATEMENT OF RELEVANT FACTS ............................................................2

    A.      The state investigation and wiretap.........................................................2

    B.      Federal investigation of Richardson ......................................................3

    C.      Richardson's motion to suppress the San Joaquin Interceptions ...................................4

    D.      Richardson now seeks suppression of federal wiretap evidence .........................................5

III.    LEGAL ANALYSIS ............................................................................................5

    A.      Even without the suppressed San Joaquin wire interceptions, there is more
        than enough probable cause to support the Court's authorization of the Federal
        Interceptions........................................................................................5

        1.      The government does not oppose suppression of the wire
            communications from the San Joaquin Interceptions. ............................................9

        2.      Electronic communications (text messages) are not subject to
            suppression under Title-III...............................................................11

        3.      Richardson has no standing to challenge the Third-Party Jail Phone—
            even if it was obtained using suppressed evidence. ..............................................13

    B.      Evidence of Richardson's guilt should not be suppressed because agents
        applied for the Federal Interceptions and relied on this Court's orders in good
        faith and without knowledge of the technical deficiencies in the applications
        for the San Joaquin Interceptions........................................................16

    C.      Evidence of Richardson's guilt should not be suppressed because the
        deficiencies in the applications for the San Joaquin Interception were
        sufficiently attenuated by the time agents applied for the Federal
        Interceptions.......................................................................................19

    D.      Richardson is the only defendant among the four moving for suppression with
        standing to suppress the San Joaquin Interceptions..........................................................22

IV.     CONCLUSION..................................................................................................23

# TABLE OF AUTHORITIES

## <u>Cases</u>

*Brown v. Illinois*,
   422 U.S. 590 (1975).................................................................................. 20

*Davis v. United States*,
   564 U.S. 229 (2011)............................................................................. 16, 17

*Herring v. United States*,
   555 U.S. 135 (2009)............................................................................. 17, 19

*Nardone v. United States*,
   127 F.2d 521 ......................................................................................... 22

*Nardone v. United States*,
   308 U.S. 338 (1939).................................................................................. 20

*People v. Jackson*,
   129 Cal. App. 4th 129 (2005) ..................................................................... 4

*Rakas v. Illinois*,
   439 U.S. 128 (1978).................................................................................. 15

*Sergura v. United States*,
   468 U.S. 796 (1984)................................................................................... 5

*United States v. Apodaca*,
   287 F. Supp. 3d 21 (D.D.C. 2017)............................................................. 12

*United States v. Banks*,
   2014 WL 4261344 (D. Kan. Aug. 29, 2014) ............................................. 13

*United States v. Brewer*,
   204 F. App'x 205 (4th Cir. 2006) .............................................................. 17

*United States v. Butz*,
   982 F.2d 1378 (9th Cir. 1993) .......................................................... 17, 18, 19

*United States v. Caymen*,
   404 F.3d 1196 (9th Cir. 2005) .................................................................. 16

*United States v. Glover*,
   736 F.3d 509 (D.C. Cir. 2013) .................................................................. 18

*United States v. Grandstaff*,
   813 F.2d 1353 (9th Cir. 1987) ................................................................... 5

*United States v. Leon*,
   468 U.S. 897 (1984).................................................................................. 16

*United States v. Malekzadeh*,
   855 F.2d 1492 (11th Cir. 1988) ................................................................ 17

*United States v. McHale,*
  495 F.2d 15 (7th Cir. 1974) ................................................................. 6

*United States v. Meling,*
  47 F.3d 1546 (9th Cir. 1995) ............................................................... 8

*United States v. Meriwether,*
  917 F.2d 955 (6th Cir. 1990) ............................................................. 13

*United States v. Mohamud*
  2014 WL 2866749 (D. Or. Jun. 24, 2014) ........................................ 17

*United States v. Moore,*
  41 F.3d 370 (8th Cir. 1994) ............................................................... 17

*United States v. Ramirez-Sandoval,*
  872 F.2d 1392 (9th Cir. 1989) ........................................................... 22

*United States v. Reed,*
  575 F.3d 900 (9th Cir. 2009) ....................................................... 12, 17

*United States v. Renzi,*
  692 F. Supp. 2d 1136 (D. Ariz. 2010) ............................................... 17

*United States v. Rice,*
  478 F.3d 704 (6th Cir. 2007) ............................................................. 18

*United States v. Smith,*
  155 F.3d 1051 (9th Cir. 1998) ........................................................... 22

*United States v. Spagnuolo,*
  549 F.2d 705 (9th Cir. 1977) ............................................................. 22

*United States v. Steiger,*
  318 F.3d 1039 (11th Cir. 2003) ......................................................... 12

*United States v. Stevens,*
  800 F. Supp. 892 (D. Haw. 1992) ..................................................... 17

*Utah v. Strieff,*
  136 S. Ct. 2056 (2016) ....................................................................... 20

*Wong Sun v. United States,*
  371 U.S. 471 (1963) ........................................................................... 22

## Statutes

18 U.S.C. § 2510(1) ................................................................................. 11
18 U.S.C. § 2510(2) ................................................................................. 11
18 U.S.C. § 2510(12) ............................................................................... 11
18 U.S.C. § 2510(18) ............................................................................... 11
18 U.S.C. § 2511 ...................................................................................... 12
18 U.S.C. § 2515 ................................................................... 1, 11, 12, 22
18 U.S.C. § 2518(1)(e) .............................................................................. 7
18 U.S.C. § 2518(10)(c) .......................................................................... 12
California Penal Code § 629.50 ................................................................. 4

# Other Authorities

1968 U.S.C.C.A.N. 2112 ........................................................................................................ 22
1986 U.S.C.C.A.N. 3555 ........................................................................................................ 11
S. Rep. 90-1097.................................................................................................................... 22

McGREGOR W. SCOTT
United States Attorney
PAUL HEMESATH
MICHAEL M. BECKWITH
Assistant United States Attorneys
501 I Street, Suite 10-100
Sacramento, CA 95814
Telephone: (916) 554-2700
Facsimile:  (916) 554-2900

Attorneys for Plaintiff
United States of America

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO.  2:17-CR-00044 KJM |
| Plaintiff, | OPPOSITION TO MOTION TO SUPPRESS EVIDENCE |
| v. | DATE: March 30, 2020 |
| JAMIE RICHARDSON, ROMMEL CIPRIANO, MICHAEL SNOWDEN-HALL, AND  JAYMAR ROSS, | TIME: 9:00 a.m. COURT: Hon. Kimberly J. Mueller |
| Defendants. | |

## I.    **INTRODUCTION**

Defendant Jamie Richardson asks this Court to suppress evidence resulting from federal interceptions of wire and electronic communications pursuant to 18 U.S.C. § 2515.  He bases his request on the outcome of his previous motion to suppress the results of certain state interceptions, which he alleged were technically deficient.  The government agreed to not oppose suppression of the state wiretaps based on the technical deficiencies in those state applications and to move on to the next stage of the analysis, which is to determine whether evidence resulting from subsequent legal process—the federal interceptions—should be invalidated by the now-suppressed state wire evidence.

This Court should deny Richardson's request for various reasons:

(1) Even without the state wiretap evidence, there is more than enough probable cause in the federal affidavits to support the Court's orders authorizing the federal interceptions;

(2) The Court and the government had no knowledge of the deficiencies in the state wiretap applications, and therefore the federal wiretaps should survive based on the good faith doctrine; and

(3) The length of time and the logical disconnection between the state and federal wiretaps sufficiently attenuates the technical deficiencies such that the federal wiretap should be allowed to stand.

## II.   STATEMENT OF RELEVANT FACTS

### A.   The state investigation and wiretap

From March 2016 through July 2016, the San Joaquin County District Attorney's Office intercepted communications over various phones connected to a gang investigation ("San Joaquin Interceptions").  The District Attorney's Office applied for authority to conduct the interceptions—of both wire and electronic communications—through applications, affidavits, and proposed orders, which were signed by a San Joaquin County Superior Court judge.  *See* Dkt. No. 84 (Defendant's Initial Suppression Brief) at 3-8.

San Joaquin County District Attorney Tori Verber-Salazar signed 20 of 32 of the applications for interceptions and extensions thereof.  For the remaining 12 applications, DA Salazar was unavailable, and therefore either Assistant District Attorney Ron Freitas or Assistant District Attorney Scott Fichtner signed those applications.  At the time, Mr. Freitas and Mr. Fichtner were the appointed Assistant District Attorneys for the Office, under Verber-Salazar.  On March 3, 2016, DA Verber-Salazar signed the first of the applications in the investigation.  On June 3, 2016, DA Verber-Salazar signed the last of the applications.

The state officers intercepted many communications as a result of the San Joaquin orders.  Of relevance here, from the last of the 32 interception periods, state officers intercepted two text message exchanges (electronic communications) between the holder of the intercepted phone (Terrence Lockett) and defendant Jaime Richardson, and one phone call (wire communication) conversation between Lockett and another person, that were eventually used in the federal affidavits[1] at issue in this proceeding.  These three communications—one phone call and two text exchanges—were the only San Joaquin Interceptions used in the federal Title III affidavit.

---

[1]  The government will consult with defense counsel to determine the best way to present the federal affidavits to the Court (e.g., in unsealed exhibits or otherwise).

The intercepted text messages (between Richardson and Lockett) suggested that Richardson was meeting Lockett, and also that Richardson needed another pound of "lacto." Richardson also texted his intent to use "Mask n gloves" in response to a question regarding a "piss test" that evening.

The intercepted phone call (between Lockett and another person—not Richardson) was apparently about him (possibly Richardson) mixing an "opiate" U-47700 so that it would appear to be similar to, but not the same as, Vicodin—a name-brand prescription opiate.

## B.   Federal investigation of Richardson

In March and April of 2016, the United States began to investigate the cause of over a dozen deaths resulting from fentanyl present in fake pills manufactured to mimic legitimate pharmaceuticals. This investigation was unrelated to the San Joaquin County gang wiretaps.

In the federal investigation, the United States developed a case against Jamie Richardson, who had been convicted previously of trafficking in manufactured pills.

On December 5, 2016, the government applied to this Court for authority to intercept certain wire and electronic communications of Richardson and others over one phone. This Court ordered such interceptions, and the Court renewed authorization for those interceptions on January 9, 2017 (adding authorization to intercept wire and electronic communications over one additional phone), and February 21, 2017 (for one phone), (collectively "Federal Affidavits"[2]). The one phone call and the two text-message exchanges from the San Joaquin Interceptions were used, along with other evidence, to support the showing of probable cause in the federal wiretap affidavits (also referenced above).

The interceptions ("Federal Interceptions") pursuant to this Court's orders showed that Richardson, Cipriano, and Snowden-Hall were engaged in a marijuana grow operation, and also that they were engaging in apparent counterfeit pill manufacture and distribution.

On February 26, 2017, Magistrate Judge Allison Claire signed search and arrest warrants based, in part, on the results of the federal intercepted wire and electronic communications.

---

[2] This brief chiefly references the first of the Federal Affidavits, filed on December 5, 2016, bearing case number 2:16-sw-0754 KJM. Therefore, citations to affidavit paragraph numbers refers to that first affidavit. The government acknowledges that the subsequent affidavits in support of additional interceptions (on January 9 and February 21, 2017) incorporated this first affidavit, by reference and cited to the results of the first series of interceptions.

Agents executing the searches found 171 marijuana plants at two locations, illegal steroids (at a location controlled by Richardson), a firearm and ammunition (in Richardson's house), over $750,000 in cash (in Richardson's house), pressed methamphetamine and counterfeit alprazolam pills (in Ross's possession), as well as computers and phones.  The computer contained additional evidence, including records showing Richardson ordered fentanyl, other drugs, and pill dies (for use in pill presses, including one with the imprint "M367"[3]) from China in 2016.  In related searches, agents seized a large quantity of N-ethylpentylone, a controlled substance analogue at a house in Sacramento, which had been delivered from China to a person with frequent contact with Richardson.

Agents arrested Richardson, Snowden-Hall, and Ross.  Rommel Cipriano fled the scene, but was arrested almost two years later.

The government obtained an indictment (followed by two superseding indictments), which charged Richardson, Snowden-Hall, Cipriano, and Jaymar Ross with various drug and gun crimes.  Dkt. Nos. 13, 43, 64.

### C.   Richardson's motion to suppress the San Joaquin Interceptions

On September 13, 2018, Richardson filed a motion to suppress the results of the San Joaquin wiretaps.  He alleged that the attorneys' applications lacked the proper oath language required by state statute and federal wiretap law ("Title III"), and that the applications were improperly made by persons other than "the district attorney, or the person designated to act as district attorney in the district attorney's absence," which is required by California Penal Code § 629.50 and Title III.  Dkt. No. 84.

On October 19, 2018, the government filed an opposition to Richardson's motion, arguing that the alleged deficiencies did not meet the standard for suppression set forth in *People v. Jackson*, 129 Cal. App. 4th 129, 150-51 (2005) and Title III.  Dkt. No. 90.

On November 19, 2018, Richardson demanded an evidentiary hearing to examine the three San Joaquin officials who had signed the series of 32 state wiretap orders at issue:  District Attorney Tori Verber-Salazar, Assistant District Attorney Scott Fichtner, and former Assistant Deputy District Attorney Ron Freitas.

---

[3] "M367" was the imprint on fake Lortab pills that were ingested by scores of people in the Sacramento area in 2016 and resulted in the deaths of over a dozen victims.

On August 21, 2019, the government agreed to assume the technical deficiencies associated with San Joaquin's wiretaps, and move on to the next phase in litigation, which is to determine the effect of those deficiencies on the subsequent legal process.[4]  Dkt. No. 132.

### D.   Richardson now seeks suppression of federal wiretap evidence

On February 21, 2020, Richardson filed a brief seeking suppression of "federal wiretap evidence."  Dkt. No. 154.  This document is a response to that pleading.

### III.   LEGAL ANALYSIS

Richardson argues, summarily, that suppression of the San Joaquin wiretap evidence must result in the suppression of (1) the Federal Interceptions and (2) evidence obtained from search warrants, which were based, in part, on the Federal Interceptions.

Richardson's argument fails because:

A. Even without the state wiretap evidence—one voice call and two text message exchanges[5]—there is more than enough probable cause to support the Court's approval of the federal interceptions (independent source doctrine);

B. The Court and the government had no knowledge of the deficiencies in the state Title III, attorney-filed applications, and therefore the federal wiretaps should survive based on the good faith doctrine; and

C. The length of time and the logical disconnection between the state and federal wiretaps sufficiently attenuates the technical deficiencies such that the federal wiretap should be allowed to stand (attenuation doctrine).

### A.   Even without the suppressed San Joaquin wire interceptions, there is more than enough probable cause to support the Court's authorization of the Federal Interceptions.

Richardson argues that the affidavits supporting the Federal Interceptions contained evidence obtained as a result of the San Joaquin Interceptions, and therefore all evidence resulting from those interceptions must be suppressed.  This is incorrect.

The proper procedure to ascertain the effect of the suppressed San Joaquin Interceptions on the Federal Interceptions is to determine whether the Federal Affidavits, purged of the suppressed

---

[4] On June 27, 2019, Freitas filed a lawsuit against the County of San Joaquin and Verber-Salazar alleging various acts of discrimination.  The case is ongoing.  The subject matter of the lawsuit has nothing to do with the present motion.

[5] As is argued below, the text message exchanges should not be suppressed in any case, because Title III does not provide for suppression of electronic communications.

information, still afford a sufficient basis for authorizing the wiretaps.  *See, e.g., Sergura v. United States*, 468 U.S. 796, 814 (1984); *United States v. Grandstaff*, 813 F.2d 1353, 1355 (9th Cir. 1987); *see also United States v. McHale*, 495 F.2d 15, 17 (7th Cir. 1974) (A wiretap order is not invalid where "[t]here was sufficient information to find probable cause based on the untainted proper sources listed in the [wiretap] application. . . . This is the same principle which is applied in reviewing the issuance of search warrants where there is a question of whether there was sufficient probable cause to issue a warrant in which both tainted and untainted sources are set forth in the application.").

Here, even if the evidence obtained from the San Joaquin County wire interceptions is purged from the probable cause section of the Federal Affidavits, there is still sufficient evidence in the Federal Affidavit to support a probable cause finding.  The Federal Affidavit contains evidence roughly categorizable into four sources:

- Evidence unrelated to the San Joaquin Interceptions or the "Third-Party Jail Phone"
- Evidence from a phone call (wire communications) that San Joaquin County intercepted
- Evidence text messages (electronic communications) that San Joaquin County intercepted
- Evidence seized from a phone belonging to a third party being held at the Sacramento County Jail ("Third-Party Jail Phone")

The table on the following page summarizes the four categories of evidence in terms of their appearance in the first Federal Affidavit.

| | |
|---|---|
| Paragraphs containing no material potentially suppressible under § 2515 | 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, 32, 33, 34, 35, 36, 37, 38*, 39, 40, 41, 42, 43, 44, 45, 46, 47, 48, 49, 50, 51, 52, 53, 54, 55, 56, 57, 58*, 78, 79, 80, 81, 82, 87, 89, 90, 91, 92, 93, 94, 95, 96, 97, 98, 99, 100, 101, 102, 103, 104, 105, 106, 107, 108, 109, 110, 111, 112, 113, 114, 115, 116, 117, 118, 119, 120, 121, 122, 123, 124, 125, 126, 127, 128, 129, 130, 131, 132, 133, 134, 135, 136, 137, 138, 139, 140, 141, 142, 143, 144, 145, 144, 145, 146, 147, 148, 149, 150, 151, 152, 153, 154, 155, 156, 157 |
| Paragraphs containing no § 2515 suppressible material because they rely on the Third-Party Jail Phone | 65, 66, 67, 68, 69, 70, 71, 72, 73, 74, 75, 76, 77, 83, 84, 85, 86, 88 |
| Paragraphs containing no § 2515 suppressible material because they rely on electronic evidence not suppressible under § 2515 | 59, 60, 62 |
| Paragraphs to be excised in part because they contain some information referencing phone conversations suppressible under § 2515 but also information that survives | 63, 64 |
| Paragraphs to be excised in total because they are based on a phone conversation suppressible under § 2515 | 61 |

\* While the interception of wire communications was referenced in these paragraphs based on the statutory requirement at 18 U.S.C. § 2518(1)(e) that requires a "full and complete statement" of all previous wiretap applications involving the persons specified in the application, no substantive evidence from the San Joaquin Interceptions was referenced.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

The following chart describes the process to determine which evidence the Court should consider in the determination of whether there is sufficient probable cause in the Federal Affidavit after excising the wire evidence from that document:



With the inclusion of electronic (but not wire) evidence from the San Joaquin Interceptions and the data from the Third Party Jail Phone, as well as evidence from independent sources, the Federal Affidavit contains more than enough probable cause to support its order allowing the Federal Interceptions.  There is thus no basis to suppress the Federal Interceptions, which, in turn, are the bases for search warrants and the indictments against the defendants.

As a general matter, to find sufficient probable cause to authorize a Title III interception, the issuing judge must find probable cause to believe that (1) an individual is committing, has committed, or is about to commit specified offenses, (2) communications relevant to that offense will be intercepted through the interception, and (3) the individuals who are the focus of the wiretap investigation will use the tapped device.  *United States v. Meling*, 47 F.3d 1546, 1552 (9th Cir. 1995) (citing 18 U.S.C. § 2518(3)(a)-(d)).

Even without the evidence from the suppressed San Joaquin Interceptions, the Federal Affidavit

still contained overwhelming probable cause to intercept Richardson's communications.   Paragraphs

31-57, in particular, contain substantial evidence in support of the Federal Interceptions.  This evidence

includes, but is not limited to, links from certain fentanyl deaths to Richardson, common-call analysis,

GPS location data, confidential informant information and other evidence.

### 1.   The government does not oppose suppression of the wire communications from the San Joaquin Interceptions.

Consistent with previous filings, the government does not oppose suppression of the wire

communications (the phone call) from the San Joaquin Interceptions that was used in the Federal

Affidavits.  That evidence, a single telephone call not involving Richardson, was used in the Federal

Affidavits as follows, at paragraph 61:

> 24   WALTERS: "I'm about to come over there..."
> LOCKETT: "...he say he probably can't do it today cause he gotta see his
> 25   P.O....so he don't want that shit to be in his piss test...he say he can do the
> other shit for you, but it ain't the same as a vicodin....cause one's oxy-
> codone and one's hydrocodone...so you use the stuff...probably use 50
> 26   percent more..."
> WALTERS: "...yeah, but I got the....what's that shit...the U7770....that's
> 27   what I got...that'll work?"
> LOCKETT: "...U4770?...it's a opiate....U47770....447770..."
> 28   WALTERS: "Yeah, that's what I got, that shit will work?"
>
> 1   LOCKETT: "...he says he gonna use double the amount because it got a
> short dilation..."
> 2   WALTERS: "...so double the amount on that one..."

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

In Paragraph 63, the agent-affiant offered an overall conclusion based, in part, on the phone call from the San Joaquin Interceptions.  The government concedes that the struck-through sentences are the content that the government argues should be excised (the rest is from non-suppressible sources, as will be further explained in this brief):

> 63.  ~~Based on my training and experience, I believe LOCKETT and WALTERS are discussing U-47700, which I know to be a synthetic opioid used in the manufacture of counterfeit narcotic tablets.~~[12]  Based on my training and experience, I know lactose is a binding agent used in the manufacture of pharmaceutical tablets.  In this context, I believe the "lacto" RICHARDSON refers to is lactose.  I also believe RICHARDSON's use of the numbers "4" and "4.5" are used to indicate quantities of tablets; in this case, I believe RICHARDSON is stating he can manufacture approximately 4,000 to 4,500 tablets if LOCKETT procures another pound of lactose.  ~~In conjunction with LOCKETT's earlier communications with RICHARDSON on that date, I believe RICHARDSON and LOCKETT met to discuss the manufacture of tablets containing U-47700.~~  From these exchanges, I believe that during their initial meeting, RICHARDSON indicated he did not want to manufacture tablets on June 8, 2016, because RICHARDSON was unsure whether or not he would be subject to a drug test by his probation officer.  I also believe that RICHARDSON later decided wearing a mask and gloves would be sufficient protection if RICHARDSON were to manufacture tablets that evening.  Thus, I believe LOCKETT and RICHARDSON were involved in the manufacture of counterfeit narcotic tablets ~~containing U-47700.~~[13]

In paragraph 64, there is also a part of an agent-affiant conclusion that should be lightly excised, in part (see strike-throughs):

> 64.  Based on the foregoing, I believe that LOCKETT and RICHARDSON (using **RICHARDSON Predecessor Telephone B**) have conspired to manufacture tablets to look like legitimate prescription opiate pills (such as Norco or Lortab, which contains hydrocodone and bears the stamp "M367"), but actually contain a different, cheaper but more powerful opiate, such as ~~U-47700 and/or~~ fentanyl.

But these excisions simply not enough to render the remainder of the Federal Affidavit insufficient.

2.      **Electronic communications (text messages) are not subject to suppression under Title-III**

Richardson's brief does not distinguish between *wire* communications[6] and *electronic* communications[7] resulting from the San Joaquin Interceptions.  The difference between the two is crucial because Title III does not contain a statutory suppression remedy for *electronic* communications—only for *wire* or oral[8] communications.  This is made clear in the plain text of the statute:

> **§2515. Prohibition of use as evidence of intercepted wire or oral communications**
>
> Whenever any <u>wire or oral</u> communication has been intercepted, no part of the contents of such communication and no evidence derived therefrom may be received in evidence in any trial, hearing, or other proceeding in or before any court, grand jury, department, officer, agency, regulatory body, legislative committee, or other authority of the United States, a State, or a political subdivision thereof if the disclosure of that information would be in violation of this chapter.

18 U.S.C. § 2515 (emphasis added).

The text of § 2515 notably omits the term "electronic" from the types of intercepted communications that are subject to statutory suppression.  We know that this omission was deliberate for various reasons.

First, Congress specifically declined to amend Section 2518(10)(a) to allow for statutory suppression of intercepted electronic communications when it amended Title III in 1986, as is confirmed in its legislative history.  *See* S. Rep. 99-541, at *23, 1986 U.S.C.C.A.N. 3555, 3577 ("The purpose of

---

[6] 18 U.S.C. § 2510(1):  "'wire communication' means any aural transfer made in whole or in part through the use of facilities for the transmission of communications [....]"  The statute defines "aural transfer" as aural transfer as a transfer "containing the human voice at any point between and including the point of origin and the point of reception."  18 U.S.C. § 2510(18).  In other words, a wire communication is a phone call.

[7] 18 U.S.C. § 2510(12):  "'electronic communication' means any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system that affects interstate or foreign commerce, but does not include—(A) any wire or oral communication [....]"  In other words, an example of an electronic communication is a text message.

[8] 18 U.S.C. § 2510(2):  "'oral communication' means any oral communication uttered by a person exhibiting an expectation that such communication is not subject to interception under circumstances justifying such expectation, but such term does not include any electronic communication[.]  In other words, an intercepted oral communication is a face-to-face conversation might be captured by a hidden microphone in a room (a "bug").

this provision is to underscore that, as a result of discussions with the Justice Department, the Electronic Communications Privacy Act does not apply the statutory exclusionary rule contained in [T]itle III…to the interception of electronic communication.)

Second, Congress's intent is further confirmed in the plain text of the statute itself: The word "electronic" appears with the word "wire" throughout the text of Title III. For example, the title of the very first substantive section of Title III reads: "Interception and disclosure of <u>wire, oral, or electronic communications</u> prohibited." 18 U.S.C. § 2511. This pattern—including the term "wire" with "electronic"—repeats throughout Title III approximately 78 times. In just a few instances in the statute, Congress deviated from this pattern. In the one instance relevant here, Congress excluded electronic communications from the statutory suppression that wire (and oral) communications could suffer for not following the strictures of Title III. Just on the plain reading of the statute, the Court should not apply § 2515 suppression remedies to the text messages intercepted by San Joaquin County.

Section 2518(10)(c)—the other part of Title III that mentions electronic communications without wire communications in a relevant way—explicitly reinforces that electronic communications are to be treated differently and less strictly than wire communications, in that only constitutional remedies apply to intercepted electronic communications:

> The remedies and sanctions described in this chapter with respect to the interception of <u>electronic communications</u> are the only judicial remedies and sanctions for nonconstitutional violations of this chapter involving such communications.

18 U.S.C. § 2518(10)(c) (emphasis added) (in other words, the statutory remedies in § 2515 do not apply).

Third, courts recognize that Title III does not provide for statutory suppression of electronic communication. S*ee United States v. Apodaca*, 287 F. Supp. 3d 21, 31 (D.D.C. 2017) (holding that the statutory exclusion remedy is limited to improper interception of wire and oral communications); *see also United States v. Reed*, 575 F.3d 900, 915 (9th Cir. 2009) (finding that "the failure to seal [electronic communications] would not require suppression" because "[s]uppression for violation of the statute is permitted only for 'wire or oral communications.'"); *United States v. Steiger*, 318 F.3d 1039, 1050–51 (11th Cir. 2003) (finding that electronic communications are not subject to suppression for a non-

constitutional violation under Title III); *United States v. Meriwether*, 917 F.2d 955, 960 (6th Cir. 1990) ("The ECPA does not provide an independent statutory remedy of suppression for interceptions of electronic communications."); *United States v. Banks*, 2014 WL 4261344, at *2 (D. Kan. Aug. 29, 2014) ("the statutory suppression remedy extends to wire and oral communications only").

If electronic communications (text messages) are not suppressible for a statutory violation under §§ 2515 and 2518(10), then they are subject only to the ordinary rules of Fourth Amendment suppression law.   Richardson has never alleged a Fourth Amendment or Rule 41 violation—nor could he, as neither the Fourth Amendment nor Rule 41 require the attorney-applicant to swear the application under oath or be the "person designated to act as the direct attorney in the district attorney's absence." Both of these requirements are purely creatures of federal and state statutory law, and do not implicate Fourth Amendment issues.

The result of this important distinction between *wire* and *electronic* is that the text messages intercepted by San Joaquin County are not subject to suppression.  This fact weighs heavily in the independent-source analysis below because it means that the only evidence that should be excised from the Federal Affidavit is a single phone call (a wire communication, which is admittedly suppressible). The text messages (electronic communications), discussing Richardson's use of "mask n gloves" to avoid a potential positive result in a "piss test" in the context of a pill manufacturing scheme, survive and are part of the probable cause that supports the Federal Interceptions.  This evidence speaks for itself as set forth in paragraphs 59, 60, 62, and partially in paragraphs 63 and 64—even when excising the single phone call.

### 3. Richardson has no standing to challenge the Third-Party Jail Phone—even if it was obtained using suppressed evidence.

Other evidence that supports probable cause in the Federal Affidavit—mostly stored text messages—comes from a phone at the Sacramento County Jail that was seized and searched pursuant to a warrant.  The phone belonged to someone other than Richardson—Joseph Mose, who had been arrested on other charges, and whose phone was held in his property inventory.  Richardson does not challenge the use of this evidence in the Federal Affidavit, but he may argue in his reply that this evidence should be excluded because the warrant was based, in part, on the San Joaquin Interceptions.

Here again, Richardson would be wrong, but for an additional reason—Richardson has no standing to challenge the search of the Third-Party Jail Phone because he has no possessory interest in it. This lack of standing prevents Richardson from even raising a challenge to the evidence from the Third-Party Jail Phone—even it was illegally obtained, which it was not.[9]  Furthermore, much like the Federal Affidavit, there is sufficient probable cause in the Third-Party Jail Phone search warrant to pass muster, even without the San Joaquin Interceptions.

### a. History and significance of the Third-Party Jail Phone

On October 11, 2016, the government obtained a warrant (2:16-SW-616 CKD) to search a Samsung Galaxy S5 cellular telephone that was held at the Sacramento County Jail.  The phone belonged to Joseph Mose, who was then incarcerated at the Jail for a probation violation.

On the phone, Agents found text messages between Mose and Richardson.  Those messages were portrayed in the Federal Affidavit in paragraphs 65, 66, 67, 68, 69, 70, 71, 72, 73, 74, 75, 76, 77, 83, 84, 85, 86, and 88.  Again, those paragraphs largely speak for themselves, but in summary, they show:

- Mose was the middleman in an oxycodone pill transaction involving another person and Richardson as the apparent supplier.  Paragraphs 68-69.

- Mose was again the middleman in an oxycodone pill transaction involving another person and Richardson as the apparent supplier.  Paragraphs 70-71.

- Mose and Richardson had a long text exchange in which Mose was asking for additional pills (a "box" implying 500 pills) from Richardson, and Richardson asked Mose if "Is it too much octane" which indicated that Richardson wanted to know if the pills were too strong.  This also suggested that Richardson was manufacturing the pills himself. Paragraphs 72-73.

- Mose and Richardson had a conversation discussing obtaining new phones together, which was relevant to the timing of the deaths from overdoses that appeared in the news. Paragraphs 74-76.

- The affiant-agent interpreted the data from the Third Party Jail Phone to conclude that a person called Mose seeking to purchase controlled substances, and then Mose and Richardson had a text conversation regarding a transaction about narcotic and/or counterfeit pills.  Paragraph 77.

---

[9] Even with standing, Richardson's argument would fail because the independent sources in the affidavit supporting the warrant for the Third-Party Jail Phone would provide sufficient probable cause. This argument is also based, in part, on the inclusion of the non-suppressible text messages from the San Joaquin wire, as was previously argued with regard to their use in the Federal Affidavits.

- Further texts between Mose and others confirm that Mose was in the business of selling pills, even mentioning "Norcos" by name.  Paragraphs 83-85.

These text conversations provide more than ample evidence to support the Federal Interceptions.

### b. Richardson does not have standing to challenge the search of the Third-Party Jail Phone—even if it was illegally searched (which it was not)

The affidavit in support of the search warrant for the Third-Party Jail Phone (the "Warrant Affidavit") depends, in part, on the San Joaquin Interceptions—both wire and electronic communications.  Richardson does not argue the fruits of this warrant should be suppressed (and therefore that argument is waived).  The Warrant Affidavit is substantially similar to the Federal Interception Affidavit in its content and structure.  One might argue, therefore (although Richardson does not), that the Warrant Affidavit should be subject to the same excision/independent-source analysis as the Federal Affidavit before the fruits of this warrant can be considered as a basis for probable cause in the Federal Affidavit.

But this analysis is not necessary as Richardson does not have standing to challenge the warrant for the Third-Party Jail Phone.  He was not an owner of the phone and he did not have an expectation of privacy in any data stored on that phone.  As a result, Richardson does not have standing to challenge the search of the phone—even if the search of that phone was search was illegal and based in part on suppressed wire evidence from the San Joaquin Interceptions.

The principle that persons may not challenge the validity of searches of property belonging to other people is well established.  "Fourth Amendment rights are personal rights…which may not be vicariously asserted," held the Supreme Court in *Rakas v. Illinois*, 439 U.S. 128, 134-35 (1978).

In *Rakas*, the Court considered a police search of a vehicle that the defendants occupied, but did not own or in which they otherwise had an interest.  The police found a gun and ammunition in the car.  The defendants moved to suppress that evidence.  The trial court found that the defendants had no standing because they had no possessory interest in the car, and therefore the court did not consider whether there was probable cause to search the car—there was no standing to even ask the question.

On review, the Supreme Court confirmed that the trial court was right to not consider whether there was probable cause to search the car because the defendants had no standing to raise the question.

The Court undertook a thorough analysis of whether the *Rakas* defendants might assert a colorable basis for standing based on their legitimate presence in the car.  Such presence was not enough, and the Court ruled that the lower courts correctly refused to decide whether the search of the car might have violated the rights secured to someone else by the Fourth Amendment.  Since the police had not violated the rights of the defendants, their convictions were affirmed.  No analysis of probable cause was necessary.

Here, the *Rakas* car is the Third-Party Jail Phone and the passenger is Richardson.  He has no ownership of the phone, and he has no expectation of privacy in any data stored on the phone.  The right to challenge the search belongs to Mose, and to Mose alone.  As a result, this Court need not determine whether there was sufficient probable cause to support the warrant after excising the suppressed San Joaquin Interceptions from the Warrant Affidavit.  *See also United States v. Caymen*, 404 F.3d 1196 (9th Cir. 2005) (finding that a defendant who lacks a reasonable expectation of privacy in a computer has no standing to challenge the seizure of that computer).

Standing is a prerequisite to even considering whether evidence resulting from a warrant should be suppressed.  The evidence from the Third-Party Jail Phone need not be excised when this Court determines whether there is sufficient probable cause to support the Federal Interceptions.

**B.    Evidence of Richardson's guilt should not be suppressed because agents applied for the Federal Interceptions and relied on this Court's orders in good faith and without knowledge of the technical deficiencies in the applications for the San Joaquin Interceptions.**

If the Court determines that, without the single call from the San Joaquin Interceptions, the Federal Affidavit did not contain sufficient probable cause, the Court still should not suppress evidence obtained from the Federal Interceptions because the good-faith exception to the exclusionary rule applies.

The United States Supreme Court has recognized a good-faith exception to the exclusionary rule where evidence obtained in objectively reasonable reliance on a warrant is admissible even if the warrant is determined subsequently to be invalid.  *United States v. Leon*, 468 U.S. 897, 922 (1984).  The exclusionary rule represents "a judicially created remedy designed to safeguard . . . [constitutional] rights generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved."  *Leon*, 468 U.S. at 906; *see also Davis v. United States*, 564 U.S. 229, 236 (2011).  As a

result, the exclusionary rule is not a "necessary consequence of a Fourth Amendment violation" and only applies "where it results in appreciable deterrence." *Herring v. United States*, 555 U.S. 135, 141 (2009).  In analyzing the need for deterrence and the need to invoke the exclusionary rule, "the benefits of deterrence must outweigh the costs." *Id.* at 141; *see also Davis*, 564 U.S. at 237.  As a result, "[t]he extent to which the exclusionary rule is justified by these deterrence principles varies with the culpability of the law enforcement conduct."  *Herring*, 555 U.S. at 143.  As the Court said in *Davis*, "When the police exhibit 'deliberate,' 'reckless,' or 'grossly negligent' disregard for Fourth Amendment rights, the deterrent value of exclusion is strong and tends to outweigh the resulting costs. . . . But when the police act with an objectively reasonable good-faith belief that their conduct is lawful, . . . the deterrence rationale loses much of its force." 564 U.S. at 238 (internal citations and quotation marks omitted).

The Ninth Circuit has strongly suggested that the good-faith exception precludes suppression of evidence in Title III wiretap cases.  *See, e.g.*, *United States v. Reed*, 575 F.3d 900, 917 (9th Cir. 2009) (finding that suppression of a Title III wiretap would not be warranted based on a failure to properly seal evidence obtained from the wiretap "because the Government acted in good faith" on its interpretation of the law); *United States v. Butz*, 982 F.2d 1378, 1383 (9th Cir. 1993) (holding that the good-faith exception applied to deny suppression of wiretap evidence based in part on pen register information obtained in good faith reliance on then-existing state laws); *see also United States v. Renzi*, 692 F. Supp. 2d 1136, 1152-53 (D. Ariz. 2010) (noting that, "given the state of the law at the time, the agents' reliance on the warrant issued by the district court was objectively reasonable" and as a result, suppression of the wiretap evidence would not have any deterrent effect and was unwarranted).

Other Circuits, and district courts in this Circuit, have agreed that the good faith exception applies to Title III.  *See United States v. Brewer*, 204 F. App'x 205, 208 (4th Cir. 2006); *United States v. Moore*, 41 F.3d 370, 376-77 (8th Cir. 1994); *United States v. Malekzadeh*, 855 F.2d 1492, 1497 (11th Cir. 1988); *United States v. Stevens*, 800 F. Supp. 892, 904 n.22 (D. Haw. 1992) (noting that "even if the Wiretap Order was issued upon insufficient probable cause, this court would not suppress the subject intercepted communications in light of the good faith exception"); *cf. United States v. Mohamud*, No. 3:10-CR-00475-KI-1, 2014 WL 2866749, at *28-30 (D. Or. Jun. 24, 2014) (applying good faith

exception to FISA wiretaps).  *But see United States v. Glover*, 736 F.3d 509, 516 (D.C. Cir. 2013);

*United States v. Rice*, 478 F.3d 704, 712-13 (6th Cir. 2007).

Here, the good faith exception clearly applies and precludes suppression.  The federal agents who obtained the initial order for the Federal Interceptions, incorporated the fruits of the San Joaquin Interceptions into the supporting affidavit, and intercepted communications pursuant to this Court's order, in good faith reliance on (1) the validity of the San Joaquin Superior Court's authorization of the San Joaquin Interceptions for purposes of relying on evidence obtained from those interceptions in the Federal Affidavit, and (2) the validity of the this court's order authorizing the Federal Interceptions to intercept the conversations of Richardson and his coconspirators.  The good faith exception applies to law enforcement's "objectively reasonable reliance" on a warrant, or court order, later held invalid, *Leon*, 368 U.S. at 922, and as a result, the federal agents objectively and reasonably relied on wiretap orders issued by the authorizing courts.

There is no question that law enforcement acted in reasonable reliance on the apparent validity of the San Joaquin Interceptions.  The two alleged deficiencies in the attorney-applications for the San Joaquin Interceptions were: (1) the lack of oath language in the applications, and (2) the potential lack of proof regarding DA Verber-Salazar's unavailability on those days when her assistant district attorneys signed the applications.  There is no proof that the federal agents responsible for the Federal Affidavit had any knowledge of those technical defects, and the government proffers that, if called to testify, they would state the same.

The Ninth Circuit's holding in *Butz* is analogous and supports a determination that the United States acted in good faith.  In *Butz*, Idaho law enforcement officials started investigating a marijuana-trafficking conspiracy using state-court-authorized pen registers and subsequent wiretaps.  *Butz*, 982 F.2d at 1379.  Approximately one year later, federal officials started to aid in the investigation, and ultimately charged the defendant as part of the conspiracy.  *Id.*  The defendant moved to suppress the wiretaps, arguing that the applications for the wiretaps relied on pen registers that did not comply with Idaho law.  *Id.* at 1382.  The defendant argued that, during the investigation, Idaho law changed.  Early in the investigation, Idaho statutes did not require a showing of probable cause for pen registers; however, later in the investigation, the Idaho Supreme Court held a pen register to be a search under the

Idaho constitution. *Id.* In upholding the district court's denial of the motion to suppress the wiretaps, the Ninth Circuit applied the good faith exception. *Id*. at 1383. The court explained: "The interests of justice are not served by suppression in the present case. When the pen registers were ordered, the state officers acted in accordance with Idaho law as it then existed. Excluding the evidence would not further any deterrence effect." *Id.*

Like in *Butz*, the local police in the San Joaquin investigation and the federal agents in the present investigation relied in good faith on what they thought were valid procedures and admissible evidence. Because the government acted in good faith, the Court should not apply the exclusionary rule to suppress the Federal Interceptions, or the fruits thereof.

The federal agents in this case relied on the San Joaquin Superior Court's and, in turn, this Court's wiretap orders in good faith, and thus suppression of the Federal Interceptions would be a disproportionate and costly remedy. The federal agents took painstaking efforts to comply with the probable cause and necessity requirements of Title III, authored lengthy and exhaustive affidavits in support of the applications for wiretap authorization, obtained approval for those applications from high-level Department of Justice officials, and secured signed orders from the district court authorizing the interception of wire and electronic communications. The agents properly relied on the district court's review of the government's applications, which met every requirement of Section 2518, and on the fact that a previous court had had approved the state wiretap orders based on what appeared to be completely valid applications. Indeed, even had the federal agents identified any technical defect in the San Joaquin applications at the time, it would have been easy enough to avoid mention of the single call at issue in the Federal Affidavit. No purpose would be served by suppressing evidence in these circumstances. *See Herring v. United States*, 555 U.S. 135, 144 (2009) ("To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system.").

C. **Evidence of Richardson's guilt should not be suppressed because the deficiencies in the applications for the San Joaquin Interception were sufficiently attenuated by the time agents applied for the Federal Interceptions.**

There were many links in the chain between the non-substantive deficiencies in the San Joaquin wiretap applications, the Federal Interceptions and, ultimately, the evidence that resulted from the

federal search warrants.  Accordingly, the Court should find that the technical deficiencies of the San Joaquin applications "have become so attenuated as to dissipate the taint."  *Nardone v. United States*, 308 U.S. 338, 341 (1939).  This doctrine of attenuation instructs that evidence far enough removed from the illegal search may survive where "the interest protected by the constitutional guarantee that has been violated would not be served by suppression of the evidence obtained."  *Utah v. Strieff*, 136 S. Ct. 2056, 2061 (2016).

To demonstrate attenuation, the government must show that "the connection between unconstitutional police conduct and the evidence [seized] is remote or has been interrupted by some intervening circumstance, so that 'the interest protected by the constitutional guarantee that has been violated would not be served by suppression of the evidence obtained.'"  *Utah v. Strieff*, 136 S. Ct. 2056, 2061 (2016).  In assessing whether the government has met that standard, courts consider 1) the "temporal proximity" between the illegal search and the discovery of evidence, 2) "the presence of intervening circumstances," and 3) "the purpose and flagrancy of the official misconduct."  *Id*. at 2062 (*quoting Brown v. Illinois*, 422 U.S. 590, 603-04 (1975)).  In *Strieff*, the Court held that evidence seized during an unconstitutional police stop was admissible because the officer discovered the evidence after becoming aware of an existing, valid arrest warrant for the suspect.  *Id*. at 2062.  The arrest warrant served as an intervening circumstance, breaking the causal chain between the illegal search and the seizure of evidence.  *Id*.

The lengthy saga emanating from the San Joaquin Interceptions in 2016 well exceeds the brief chain of events described in *Strieff*.  As discussed above, federal agents cited only one phone call from the San Joaquin Interceptions in the Federal Affidavit.  That phone call was intercepted in the 35th application for wiretaps in the San Joaquin investigation.  District Attorney Verber-Salazar signed the application for that particular order to intercept wire (and electronic) communications.  She was, in fact, the official who was unquestionably authorized to sign the application.[10]  It is only because *previous* applications were signed by her Assistant District Attorneys, and evidence from those interceptions were

---

[10] Note the underlying controversy raised in Richardson's initial brief was that only DA Verber-Salazar or a person acting in her capacity as district attorney could validly sign the application. Richardson also argued that none of the 35 applications contained the oath language required by Title III.

used in the 35th San Joaquin affidavit, that Richardson is able to claim a technical problem in any link in this chain.

Seven months later, in a federal jurisdiction, completely different agents investigating different people for different crimes used that single phone call as part of a large body of probable cause to obtain an order for the Federal Interceptions.  Based on that apparently lawful order, federal agents obtained further evidence: intercepted wire and electronic communications involving Richardson, Cipriano, and Snowden-Hall.  That evidence showed that the three were involved in ongoing crimes in Sacramento. Based on that evidence, federal agents obtained more process—search warrants—which led to the discovery of further evidence, including scheduled drugs, $750,000 in cash, and a gun.

These facts strongly support finding attenuation under the *Strieff* factors, previously mentioned. In terms of "temporal proximity" between the impermissible search and the discovery of evidence, the time between the San Joaquin Interceptions and the applications for the Federal Interceptions was approximately seven months—and there were an additional two months between the Federal Interceptions and the eventual search warrants.

As to the presence of "intervening circumstances," the Court may look to the aforementioned chain of events starting from a San Joaquin state interception application (but taking into account that DA Verber-Salazar signed the application for the order under which the phone call was intercepted), and that the suppressible phone call was but one piece of a large body of evidence supporting probable cause in the Federal Affidavits.  The resulting Federal Interceptions served as part of the probable cause in yet another round of legal process, the federal search warrants, which were based on even a wider body of probable cause.

Finally, as to the "purpose and flagrancy of the official misconduct" the Court should consider that the deficiencies in the attorney-applications for the San Joaquin Interceptions were obviously non-substantive in nature—there was no allegation that the applications or affidavits failed to demonstrate probable cause or necessity.  In retrospect, the errors could have been cured simply by using a proper template (that included the oath language), and a written protocol for recording the unavailability of the district attorney when her assistant, acting as the district attorney, signed applications in her absence. These missteps were clearly not an effort to mislead a court, obtain evidence without sufficient probable

cause, or manufacture evidence.  Moreover, they had nothing to do with the substance of the probable

cause and necessity supporting the applications for interception.  Even more blameless are the federal

agents who relied (in part) on the San Joaquin Interceptions.  They could not be expected to investigate

the protocols of the San Joaquin District Attorney's delegation-of-authority and application process.

This weak link in the chain, alone, provides ample justification for the principle underlying attenuation:

that evidence should not be suppressed if the underlying interest in protecting the rule is not served by

suppressing the evidence at issue.

Richardson may argue that the attenuation doctrine should not apply in Title III analysis.  But the

Ninth Circuit has long held that the fruits of the poisonous tree doctrine is incorporated in 18 U.S.C. §§

2515 and 2518(10).  *United States v. Smith*, 155 F.3d 1051, 1059 (9th Cir. 1998) (citing *United States v.

Spagnuolo*, 549 F.2d 705, 711 (9th Cir. 1977)).  Further, the Ninth Circuit generally recognizes

attenuation as an exception to the fruits of the poisonous tree exclusionary rule.  *Smith*, 155 F.3d at 1059

(*citing United States v. Ramirez-Sandoval*, 872 F.2d 1392, 1396 (9th Cir. 1989)).[11]

The long and winding road from unintentional and purely technical missteps in the San Joaquin

investigation necessarily attenuated those errors through a different time period, different investigatory

teams, a different jurisdiction, and completely different defendants.  No purpose is served in suppressing

the original evidence from the San Joaquin Interceptions.

> **D.   Richardson is the only defendant among the four moving for suppression with standing to suppress the San Joaquin Interceptions.**

Although Richardson's co-defendants have joined his briefing, the government points out that

they were not "aggrieved parties" with regard to the San Joaquin Interceptions, according to 18 U.S.C.

§ 2510 (11), and therefore they have no standing to challenge the use of the San Joaquin Interceptions in

the Federal Affidavit.  Their joinders to Richardson's claims should be dismissed.

---

[11] The legislative history for Title III makes clear that Congress intended that the attenuation doctrine apply to statutory suppression under § 2515: "The provision…largely reflects existing law…. There is, however, *no intention to change the attenuation rule*."  *See Nardone v. United States*, 127 F.2d 521(2d), certiorari denied, 62 S.Ct. 1296, 316 U.S. 698 (1942); *Wong Sun v. United States*, 371 U.S. 471 (1963)."  S. Rep. 90-1097, 1968 U.S.C.C.A.N. 2112, 2185 (emphasis added).

1

## IV.   <u>CONCLUSION</u>

2

For the foregoing reasons, the Court should deny Richardson's motion to suppress evidence.

3

Dated:  March 20, 2020                                    McGREGOR W. SCOTT
4                                                                          United States Attorney

5
                                                          By:   /s/ PAUL HEMESATH
6                                                                  PAUL HEMESATH
                                                                      Assistant United States Attorney
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28